Slip Op. 18 - 57

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| HEZE HUAYI CHEMICAL CO., LTD. and JUANCHENG KANGTAI CHEMICAL CO., LTD., | |
| Plaintiff, | |
| v. | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | Court No. 17-00032 |
| Defendant, | |
| and | |
| BIO-LAB, INC., CLEARON CORP., and OCCIDENTAL CHEMICAL CORP., | |
| Defendant-Intervenors. | |

**OPINION**

[Denying motion for judgment on 2014-2015 administrative review of chlorinated isocyanurates from the People's Republic of China.]

Decided: May 22, 2018

*Gregory S. Menegaz*, *J. Kevin Horgan*, *Judith L. Holdsworth*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, for the plaintiffs.

*Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. On the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel was *Catherine Miller*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*James R. Cannon, Jr.* and *Nina R. Tandon*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the defendant-intervenors.

Musgrave, Senior Judge: The plaintiffs Heze Huayi Chemical Co., Ltd. ("Heze") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), producers and/or exporters of subject merchandise, initiated this challenge to the 2014-2015 administrative review ("POR") of the antidumping duty ("AD") order on chlorinated isocyanurates ("chlor-isos") from the People's Republic of China ("PRC"). *See Chlorinated Isocyanurates from the PRC*, 82 Fed. Reg. 4852 (Jan. 17, 2017) (final results of 2014-2015 antidumping duty admin. review) ("*Final Results*"), PDoc 177, and accompanying Issues and Decision Memorandum ("*IDM*"), PDoc 171; *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 45947 (Aug. 3, 2015). On the record compiled by the International Trade Administration, U.S. Department of Commerce ("Commerce" or "Department"), the plaintiffs invoke the court's jurisdiction under 19 U.S.C. §1516a(a)(2)(A)(i)(I) and (B)(iii), *see* 28 U.S.C. §1581(c), and move for judgment pursuant to USCIT Rule 56.2. Their claim is that the agency erred in choosing Mexico as the surrogate country upon which to value the factors of production ("FOPs") for subject merchandise and in choosing surrogate financial statements to base financial ratios. The defendant and defendant-intervenors[1] argue for dismissal. The court agrees with the defendants, in view of the following.

*Background*

Commerce typically calculates the normal value ("NV") of subject merchandise from non-market economy "(NME") producers/exporters using surrogate values ("SVs") offered "in a market economy country or countries considered to be appropriate by" Commerce. 19 U.S.C. §1677b(c)(1). Under that scenario, Commerce must utilize, to the extent possible, the prices or costs

---

[1] *I.e.*, domestic industry representatives Bio-Lab, Inc., Clearon Corp., and Occidental Chemical Corp. (together, "petitioners").

of factors of production ("FOPs") in one or more market economies countries that are (a) "at a level of economic development comparable to that of the [NME] country" and (b) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

The statute does not signal what constitutes a "comparable" level of economic development, "comparable" merchandise, or the meaning of "significant". *See* 19 U.S.C. §1677b(c)(4)(B). Pursuant to its reading of the statute, Commerce has avoided developing regulatory definitions thereof, *cf.* 19 C.F.R. §§351.102 & 351.408, but for the first of the statutory requirements its Office of Policy ("OP") produces a short list of market economy countries at a level of economic development "comparable" to the NME country (the PRC in this instance) in terms of *per capita* gross national income ("GNI") based on World Development Report data compiled by the World Bank[2] that is then disseminated to the parties for comment. *E.g.*, Memorandum to Interested Parties re: Request for Economic Development, Surrogate Country and SV Comments and Information (Aug. 14, 2015), PDoc 8 ("OP List").

Commerce's practice entails selecting the appropriate surrogate country based on the availability and reliability of surrogate values ("SVs") data for that country. In accordance with 19 U.S.C. § 1677(c)(1) and the "best available information" for valuing FOPs, Commerce's practice is to select, to the extent practicable, SVs that are product-specific, representative of a broad market average, publicly available, tax exclusive, and contemporaneous with the period of review. There

---

[2] *See, e.g.*, *Pure Magnesium from the PRC*, 75 Fed. Reg. 80791 (Dec. 23, 2010) (final results 2008-09 antidumping duty admin. review) and accompanying I&D Memo at cmt. 4. Using *per capita* GNI has been held a "consistent, transparent, and objective metric to identify and compare a country's level of economic development" and "a reasonable interpretation of the statute." *Jiaxing Brother Fastener Co. v. United States*, 38 CIT ___, ___, 961 F. Supp. 2d 1323, 1329 (2014).

is no hierarchy for applying the SV selection criteria; rather, Commerce must weigh available information with respect to each input value and make a product-specific and case-specific decision as to what is the "best" SV for each input. *See*, *e.g.*, *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 38 CIT ___, ___, 28 F. Supp. 3d 1317, 1336 (2014) (upholding Commerce's practice to "carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis of valuing the FOPs on a case-by-case basis"). For that process, the statute affords administrative discretion to examine various data sources for determining the best available information. *See* 19 U.S.C. § 1677(c); *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

　　　　　Commerce considers all countries on the OP List to be at the same level of economic development as the PRC and does not use GNI alone as the basis for its selection. It purports to evaluate which of these countries is a significant producer of comparable merchandise in addition to considering which countries have reliable data. *E.g.*, Defendant's Response to Plaintiffs' Motion for Judgment Upon the Agency Record ("Def's Resp.") at 10. For guidance on defining comparable merchandise, Commerce will look to other sources such as its Policy Bulletin 04.1, NME Surrogate Country Selection Process (Mar. 1, 2004) ("Policy Bulletin").

　　　　　For this AD review segment, OP listed Bulgaria, Ecuador, Mexico, Romania, South Africa, and Thailand as countries at the same level of economic development as the PRC based on 2014 *per capita* GNI. Commenting thereon, the respondents (plaintiffs hereat) provided Thai surrogate values but argued that Thailand did not have a usable import value for chlorine and that Commerce should follow its practice from the previous review of using the largest importer of

chlorine among the listed economically comparable countries, which in this review was Mexico. Letter from Heze and Kangtai re: SVs for the Preliminary Results (Dec. 17, 2015) ("Resps' SV Submission"), PDocs 60-70. *See* PDoc 60 at 2. The petitioners (intervenor-defendants hereat) argued Mexico or Romania were appropriate as primary surrogates because those countries have actual production of comparable merchandise as well as import values for the most major inputs used in chlor-isos production, and also because the financial statements of Mexican and Romanian companies have not previously encountered the documented difficulty in their usage as those of Thai companies. Letter from Petitioners re: SV Data (Dec. 17, 2015) ("Pets' SV Submission"), PDocs 71-82. *See* PDoc 71 at 2 n.2.

The respondents then submitted rebuttal to the petitioners' comments and also filed final SVs and comments for the preliminary results. Letter from Heze and Kangtai re: Certain Chlor-Isos from the PRC Rebuttal SVs for the Preliminary Results (Jan. 11, 2016) ("Resps' SV Rebuttal Submission"), CDoc73, PDocs 87-89, 95; Letter from Kangtai and Heze re: Certain Chlor-Isos from the PRC, Final SV Submission and Pre-Preliminary Comments (June 6, 2016) ("Resps' Final SV Submission"), CDoc 155, PDocs 124-28. In those submissions the respondents argued Mexico is neither a significant producer nor a net exporter of comparable merchandise and therefore Commerce should select as the primary surrogate country either Thailand, because it has the highest quality of data including two contemporaneous financial statements, or Romania, because it has data to value all inputs and a reliable financial statement from a major chemical producer that produces comparable merchandise. Resps' Final SV Submission at 3-6.

For their part, the petitioners' comments narrowed their argument to Mexico as the primary surrogate country because it is economically comparable to the PRC, it is the only country on the OP List that produces "substantial" quantities of chlor-isos, and Port Import/Export Reporting Service ("PIERS") data reflected that the Mexican company Aqua-Clor S.A. de C.V. ("Aqua-Clor") produced chlor-isos during the POR. *See* Letter from Petitioners re: Comments Concerning the Preliminary Determination and Submission of Factual Information Regarding SVs (June 6, 2016) ("Pets' Prelim. & SV Cmts"), PDocs 129-138, at 3, Exs. 1-3; Letter from Petitioners re: Rebuttal to Preliminary Determination Comments (June 11, 2016) ("Pets' Rebuttal Comments"), CDocs156-57, PDocs 140-41; Letter from Petitioners re: Additional Rebuttal to Preliminary Determination Comments (June 16, 2016) ("Pets' Add'l Rebuttal Cmts"), CDoc 158, PDoc 143.

The respondents' final comments argued that the statute and Commerce's policy do not establish a hierarchal preference for being a producer of identical merchandise over a producer of comparable merchandise, thus urging Commerce to determine "at a minimum" that Thailand, Romania, and Mexico are all significant producers of comparable merchandise and to rely on data quality as the basis of its surrogate country selection. Letter from Kangtai and Heze re: Rebuttal Final SVs and Rebuttal Pre-Preliminary Comments, dated June 16, 2016 ("Resps' Rebuttal Final SV Submission"), PDoc 142, at 2, 5.

In due course, Commerce published its preliminary results. *Chlor-Isos from the PRC*, 81 Fed. Reg. 45128 (July 12, 2016) (prelim. results of antidumping duty admin. review 2014-2015) ("Preliminary Results"), PDoc 146, and accompanying Preliminary Decision Memorandum ("*PDM*") at 5, PDoc 147. In prior reviews of the AD order, Commerce had found calcium hypochlorite and

sodium hypochlorite comparable to subject merchandise because those compounds all share similar physical characteristics, end uses, and production processes. *See Chlor-Isos from the PRC*, 80 Fed. Reg. 4539 (Jan. 28, 2015) (final results of AD admin. review) and accompanying I&D Memo at cmt. 2. Adhering to that course, and pursuant to its policy of determining economic comparability and suitable surrogate countries for analyzing comparable merchandise, Commerce found from the OP List that Bulgaria, Ecuador, Romania, South Africa, and Thailand are significant producers of calcium hypochlorite and sodium hypochlorite. *PDM* at 11; *IDM* at 4. Commerce noted that the sixth country, Mexico, is a producer of both identical and comparable merchandise. *Id*. After eliminating other countries from the list due to data quality considerations, Commerce narrowed the possible choices to Mexico and Romania as the only two countries that provided usable surrogate financial statements and surrogate values for chlorine and hydrogen, an important input and by-product, respectively. *Id*.

Because both Mexico and Romania were producers of comparable merchandise and each had one usable financial statement, Commerce then looked to the Policy Bulletin for guidance in selecting the primary surrogate country. *See IDM* at 20; Policy Bulletin. Such guidance led to preliminarily determining Mexico as the best choice for the primary surrogate country, a decision based in part on finding the data for the Mexican company CYDSA, S.A.B. de C.V. ("CYDSA") superior to those for the Romanian company Chimcomplex S.A. ("Chimcomplex"), with one exception concerning less-contemporaneous labor data. *PDM* at 13; *see also* Memorandum to File, re: Preliminary Results SV Memorandum, dated July 12, 2016 ("Prelim. SV Memo"), PDoc 148; *IDM* at 7-10. The determination remained unchanged in the *Final Results*. *IDM* at 3-5, 7-10.

*Discussion*

Commerce's final determinations in proceedings such as this are to be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i).

I

The plaintiffs dispute that Mexico is a significant producer of comparable merchandise. They argue Commerce failed to consider the statutory directive of determining a producer of "comparable" merchandise by overweighting the fact that Mexico produces "identical" merchandise, the volume of which they contend was insignificant in contrast to the far more significant production of "comparable" merchandise in Romania. They claim Commerce's decision "narrowed the meaning of comparable merchandise to mean identical merchandise and completely failed to actualize the significance of that production." Pls.' Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency Record ("Pls. Br.") at 2.

The statute does not speak directly to the meaning of "comparable"; therefore, Commerce's interpretation will govern if it is reasonable. *See*, *e.g.*, *United States v. Eurodif*, 555 U.S. 305, 316 (2009). Commerce found Mexico to produce both "identical" and "comparable" merchandise, and the Policy Bulletin, upon which Commerce relied, states that "[i]n all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise". The defendant posits from this that "if the record contains a producer of identical merchandise, the statutory requirement of comparable merchandise is satisfied." Def's Resp. at 10, citing 19 U.S.C. §1677b(c)(4).

Although the plaintiff apparently attempts to drive a wedge between "identical" and "comparable" merchandise in Commerce's decision, it is obvious that production of identical merchandise is production of "comparable" merchandise. *Mid Continent Nail Corp. v. United States*, 34 CIT 512, 519, 712 F. Supp. 2d 1370, 1377 (2010). *See also Dorbest Ltd. v. United States*, 30 CIT 1671, 1682, 462 F. Supp. 2d 1262, 1273 (2006) ("*Dorbest*") ("[c]omparable merchandise is a broader category than the 'such or similar' merchandise comparison which is usually used in antidumping investigations"), quoting S. Rep. No. 100-71 at 106 (1987). The crux of the plaintiffs' argument, rather, is with respect to the statutory requirement that a "producer" (*i.e.*, market economy country) of such merchandise be "significant". *See* 19 U.S.C. §1677b(c)(4)(B).

In that regard, the plaintiffs contend that because Mexico is not a net exporter with production of identical merchandise sufficient to influence or affect world trade, it is therefore an insignificant producer of comparable merchandise. The defendant is correct, however, that the ability to influence world trade is not a standard required by the statute, "it is only one of many criteria the Department may use to determine whether a country is a significant producer." *IDM* at 5. *See also*, *e.g.*, H.R. Conf. Rep. 100-576 at 590, 1988 U.S.C.C.A.N. 1547, 1623 ("[t]he term 'significant producer' *includes* any country that is a significant net exporter and, if appropriate, Commerce may use a significant net exporting country in valuing factors) (italics added).

On the other hand, the plaintiffs' contention indicates that they interpret Commerce's position to mean Commerce may consider the mere fact of production of identical merchandise as "significant" in relation to production of comparable merchandise.[3] And it is clear that Congress

---

[3] *See*, *e.g.*, Def's Resp. at 12 ("Commerce determined that Mexico was the appropriate
(continued...)

intended "significant" to be interpreted with respect to quantitative measures of production, not merely in terms of the degree of similarity of the surrogate product to the subject merchandise. *See*, *e.g.*, H.R. Conf. Rep. 100-576 at 591, 1988 U.S.C.C.A.N. at 1624 ("Commerce should seek to use, if possible, data based on production of the same general class or kind of merchandise using similar levels of technology and at similar levels of volume as the producers subject to investigation"). The plaintiffs thus argue that the quantity of Mexican production of chlor-isos is uncertain, *i.e.*, that even assuming the 2,159 to 2,534 (*cf.* Pls' Br. at 4 *with id.* at 5) tons of the product exported from Mexico under Harmonized Tariff Schedule ("HTS") item 2933.69.03 during the POR are all chlor-isos,[4] Commerce still needs to articulate why "this small amount is a significant quantity" given that Mexico is a net importer of that product. Pls' Br. at 4-5.

    The court disagrees, as exportation is not the only indicium of the significance of production on this record. *See*, *e.g.*, *PDM* at 11 (citing: Petitioners' SC Comments at 3-4 and Exh.

---

  [3] (...continued)
primary surrogate country because Mexico produced identical merchandise and the selection of Mexico would not lead to factor valuation difficulties" and thus "Commerce stated that it was 'not required to consider parties' arguments for comparable merchandise'"), quoting *IDM* at 20; *see also* Policy Bulletin at 2 ("[i]n cases where identical merchandise is *not* produced, the team must determine if other merchandise that is comparable is produced") (italics added) & *id.* at 5 n.6 ("[i]f considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise"). In other words, Commerce's preference for identical merchandise over a broader category of similar merchandise must "take second-seat if the use of identical goods leads to data selection problems." *Dorbest*, 30 CIT at 1682, 462 F. Supp. 2d at 1274.

  [4] HTS 2933.69.03 is a basket category that would include chlor-isos and other compounds including an unfused triazine ring. *See IDM* at 2. The plaintiffs contend Commerce has not historically relied upon this HTS item to determine significance of comparable merchandise but they also acknowledge that the PIERS Mexican export data of record describe exports under the more precise HTS item of 2933.69.03 as "trichloroisocyanuric acid." Pls' Br. at 4, referencing Pets' Final SVs (June 6, 2016) at Exs 3, PDocs 129-138.

3, CDoc 64, PDoc 43; Pets' Prelim & SV Cmts at 3 and Exs. 1-3, PDoc 129-138; Pets' Rebuttal Cmts at 2 & Exh. 1, CDoc 156-57, PDoc 140-41; Resps' SC Cmts at 2-3, PDoc 50). Commerce agreed that the petitioners' submission of a certain affidavit and joint venture agreement demonstrated significant Mexican production of chlor-isos by Aqua-Clor and corroborated "extensive PIERS cross-border trade data" on shipments of subject merchandise on the record. *IDM* at 4 (citing: Pets' Rebuttal Cmts at 2 & Exh. 1; Pets' Add'l Rebuttal Cmts at 3). The record also included a publication from the International Trade Commission, which had found Mexico to be a source of United States imports of chlor-isos in 2014, *i.e.*, covering this POR. *Id*. at 5. Record data also showed Mexican exports by truck and rail during the POR of about 3,019,331 kilograms of identical merchandise. Pets' Prelim & SV Cmts at 4, Ex. 1, PDoc 129. Commerce also explained that the volume of Mexico's exports "does not negate the fact that Mexico is a significant producer" because its export volumes are driven by the fact that "Mexico is a larger consumer of comparable merchandise than Romania." *IDM* at 5. The foregoing substantiates Mexican production of "comparable" merchandise as "significant."

        The plaintiffs, however, emphasize that Romania's 18,542 tons of "comparable" merchandise exports of calcium or sodium hypochlorite under HTS 2828.90 and 2828.10 ranked it as the 17th largest exporter and a net exporter at that, while Mexico's exports of 750 tons ranked it as 48th but still a net importer. In other words, Romanian exports represent "almost 2% of world trade while Mexican exports represent only 0.07%". *Id*. at 5 (chart omitted).[5] This analysis, apart

---

[5] The defendant here contends the plaintiff's tabular analysis and its conclusion that Mexico represents 0.07 percent net world exports on page 6 of their brief, is problematic in multiple respects: (1) the chart includes only two of the relevant commodity codes, HTS 2828.90 and 2828.10, but not

(continued...)

from the question of its accuracy (*see* note 5), is insufficient to undermine Commerce's determination on the "significance" of Mexico's production in its own right. *See supra*.

In the final analysis, Commerce has been delegated the task of finding relevant facts from a given record, and it has the discretion to determine whether a given volume, value or quantity is "significant" under the statute after "taking into account the entire record, including whatever fairly detracts from the substantiality of th[at] evidence." *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (bracketing added). *Accord Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Commerce determined that both Mexico and Romania "are at a comparable level of economic development" pursuant to 19 U.S.C. §1677(c)(4); both are significant producers of comparable . . . merchandise; and both have publicly available and reliable data for all the identified inputs submitted by interested parties." *PDM* at 12. Commerce's "evidentiary decisions are reviewed for abuse of discretion" while its "findings of fact are reviewed for clear error", *NSK Ltd. v. United States*, 510 F.3d 1375, 1379 (Fed. Cir. 2007), and this court perceives neither in Commerce's determination on the significance of Mexican production, which is therefore supported by substantial evidence on the record and in accordance with law.

---

⁵ (...continued)
include 2933.69, the basket HTS code that includes identical merchandise, and therefore is not a reasonable reflection of exports of identical merchandise; (2) the plaintiffs did not rely upon the analysis reflected in that chart during the administrative process (*see* Respondents SC Comments, Ex. 2 (including commodity code 2933.69, which is later omitted from their analysis), PDoc 50) and thus argument relying upon this compilation of data to derive percentages for net world exports is waived; and (3) even if the chart can establish that Mexico was not a significant net exporter, it would also establish that Romania was not a significant net exporter. The plaintiff complains that Romania exported 25 times as much as Mexico, is a net exporter, and had influence on world trade unlike Mexico, but all of this is beside the point. *See infra*.

II

As mentioned, Commerce selected CYDSA's financial statements ("FS") for calculating financial ratios. CYDSA is a producer of comparable merchandise, not identical merchandise, but Commerce "has wide discretion in choosing among various surrogate sources," *FMC Corp. v. United States*, 27 CIT 240, 251 (2003), *aff'd*, 87 Fed. Appx. 753 (Fed. Cir. 2004). "The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect." *Home Meridian Int'l, Inc. v. United States*, 772 F. 3d 1289, 1296 (Fed. Cir. 2014); *see also Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F. 3d 1289, 1301 (Fed. Cir. 2016) ("[t]hough the data may be imperfect, the administrative record supports [Commerce's] conclusion"); *QVD Food Co., Ltd. v. United States*, 658 F. 3d 1318, 1322 (Fed. Cir. 2011) (acknowledging that Commerce had made a reasonable choice given "imperfect alternatives"). Commerce found Mexico to have better surrogate value data than Romania, noting record evidence indicated that Mexico had surrogate values for all inputs with the exception of steam coal while Romania had surrogate values for all inputs with the exception of steam, and that Mexico's labor data was not contemporaneous but Romania's electricity and water were also not contemporaneous. *IDM* at 11-13.

Emphasizing here that Romania nonetheless fulfills all the surrogate country criteria, the plaintiffs contend that the data of record for Romania do not suffer from the "grave" deficiencies of the data for Mexican production. They first contend that the cost of developing "massive energy plants" shown in CYDSA's 2014 and 2015 financial statements is

> reflected in part in CYDSA's astronomical SG&A expense 45.81% in 2015 and 31.77% in 2014, while the more comparable Romanian and Thai chemical

      companies' ratios on the record ranged from 6.37% to 17.75% in 2014 and 2013 and 2012, consistent with the range for this ratio assigned by the Department in recent segments (notably the Department relied on the 2013 ratios of Aditya Birla in POR9 and the 2012 ratios of Aditya Birla in POR8). There is no reasonable explanation or expectation that the SG&A of the respondents would have doubled or tripled from one segment to the next.

Pls' Reply at 6-7 (citation omitted).[6] The plaintiffs complain that Commerce did not address this. *See also* Pls' Br. at 9-12.

      The defendant argues Commerce did address the development of CYDSA's energy division at both the preliminary and the final stages of the review. *See PDM* at 12-13; *IDM* at 9. Commerce first found that the plaintiffs' "argument[ ] stating that CYDSA production processes and products dissimilar to those of respondents is not accurate and does not reflect the information on the record." *IDM* at 9. The plaintiffs allege CYDSA has three operating divisions, Pls' Br. at 11-12, but Commerce only found two operating segments in CYDSA's financial statement: the Chemical Products and Specialties segment that accounts for 96.5 percent of its total sales, and the Yarns segment that accounts for the remaining sales. *Id*.

      Commerce also found CYDSA's financial statement sufficient to value surrogate ratios because its chlorine and caustic soda accounted for 45 percent of sales within CYDSA's Chemical Products and Specialties segment, representing 43.4 percent of CYDSA's total sales. *Id*. Consistent with prior determinations, Commerce explained that 45 percent is nearly double what

---

    [6] The plaintiffs further explain that CYDSA's first electricity and steam cogeneration plant began operating in early 2014 and during 2015 produced 380 million of kilowatts-hour of electricity and 470,000 tons of steam. *See* CYDSA 2015 FS at 37, PDocs129-138; CYDSA 2014 FS at 41, PDocs 124-128. During 2014 and 2015, CYDSA built a second cogeneration plant with the same capacity. In 2015, the company also began construction on underground storage of hydrocarbons. *See* CYDSA 2015 FS at 38-39, PDocs 129-138.

Commerce determined to be sufficient to use the same financial statements to value a different product in *Hydrofluorocarbon Blends and Components Thereof from the PRC*, 81 Fed. Reg. 42,314 (June 29, 2016) (final determ. of sales at less than fair value and final affirm. determ. of crit. circum.), and accompanying I&D Memo at cmt. 30 (selecting CYDSA's financial statement even though refrigerants represented only 23.5 percent of CYDSA's total sales in 2014). The court cannot find fault in Commerce's conclusion that, "given the absence of information regarding the income generated by Chimcomplex for each product group, the Department has no way to evaluate whether its sodium hypochlorite business represents a significant or primary product of the company." *IDM* at 10.

The plaintiffs acknowledge that CYDSA did not have energy sales in 2014 but they argue nonetheless that the chlorine and caustic soda data are distorted by CYDSA's allegedly "massive" energy division. Pls' Br. at 12 ("[t]he fact that most of the sales were from the chemical division simply does not mean that most of the costs of the company are connected to the chemical division."). Commerce, however, found the plaintiffs' characterization of the energy division not supported by the evidence. Specifically, Commerce explained that CYDSA's 2015 statement reflects "only one electricity co-generation plant operating at the end of 2015 and this plant was not handling all of CYDSA's electrical needs." *IDM* at 9, citing CYDSA 2015 FS at 36. In addition, Commerce found that CYDSA uses gas and electricity as key inputs in the production of chlorine and caustic soda, further supporting the conclusion that CYDSA relies on outside purchases of electricity to support its production processes. Specifically, Commerce found that these inputs were subject to "price risk" because the Mexican public provider of electricity uses natural gas, which is

"vulnerable to the volatility of the natural gas market." *Id.*, citing CYDSA Financial Statement at 81. Furthermore, the defendant-intervenors point out that they argued in their administrative case brief, of which Commerce was presumptively aware, that the increase in administrative expenses from 2013 to 2014 due to the start-up of the cogeneration plant had a minimal impact on the ratio of administrative expenses to cost of sales (12.3% in 2014 versus 11.6% in 2013). Def-Int's Resp. at 16-17, referencing Pets' SV Cmts (Dec. 17, 2015), PDoc 75, Ex. 16 at 72. They contend that "the small change in the ratio from 2013 to 2014 does not establish that CYDSA's 2014 (much less its 2015) financial results were distorted by the start-up of cogeneration." *Id.* at 17. The court agrees.

      The plaintiffs assert nonetheless that the Romanian company Chimcomplex better represents its own infrastructure and level of integration because Chimcomplex only produces chemicals rather than two types of products like CYDSA. Pls' Br. at 11, 14. Whether that is true, the court may not "reweigh the evidence or . . . reconsider questions of fact anew", *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015), which is another way of expressing that "as to matters . . . requiring expertise a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Commerce reasoned that "[t]he information contained in Chimcomplex's financial statement does not indicate that it is any less integrated" because "information on the record from Chimcomplex's website shows that it has two major segments for inorganic and organic products," which is the same number of segments as CYDSA. *IDM* at 9.

Further, Commerce stated that within its seven product groups, Chimcomplex has 24 separate products, some of which were even more dissimilar than those products produced by plaintiffs. *Id*. Taking into account these numerous products, Commerce found the number of Chimcomplex's product lines to be as varied as those of CYDSA. *Id*. at 10. Thus, Commerce found both CYDSA and Chimcomplex to have two main operating segments that produce a number of products that are dissimilar to their comparable product, sodium hypochlorite. *Id*. Given these similarities between CYDSA's and Chimcomplex's statements and the lack of information as to whether sodium hypochlorite was a significant product of Chimcomplex, *id*., after concluding that levels of integration were not a meaningful factor because the respondents themselves "are vastly different in their own levels of integration", *see id*., pursuant to 19 U.S.C. § 1677(c)(1) Commerce decided CYDSA's financial statement was the best available information on the record because the major chlor-iso product (sodium hypochlorite) is a significant product of CYDSA. The evidence of record and logic support that conclusion notwithstanding the plaintiffs' argument with respect to "cogeneration" that it contends is supported by Commerce's discussion of its intermediate input methodology in *Xanthan Gum from the PRC*, 80 Fed. Reg. 29615 (May 22, 2015) (2013 new shipper rev. results) and accompanying I&D Memo at 10-11. *See* Pls' Reply at 8-9.

The plaintiffs also contend the Mexican record is not superior with respect to other inputs. Pls' Br. at 18. Specifically, plaintiffs take issue with Commerce's assessment of the input values for steam, steam coal, labor, electricity, and water. Pls' Br. at 18-21. *See PDM* at 11-13; *IDM* at 11-13. Their primary concern here derives from the fact that both the Mexican and Romanian records each have usable surrogate values for all but one input -- steam for Romania,

steam coal for Mexico -- and that the latter is the important input for the plaintiffs' chlor-isos production because they use steam coal, not steam; and that the only respondent that uses steam, Hebei Jiheng Chemical Co., Ltd. ("Jiheng"), did not challenge the determination to value its steam based on Mexican data. Pls' Br. at 18. They thus assert the Romanian record is superior because its missing value, steam, is insignificant when compared to Mexico's missing value, steam coal. *Id*.

As an initial matter, it appears Commerce does not have a "practice of weighing the quality of a particular surrogate value based solely on the number of shared inputs used by each respondent." *IDM* at 11. Commerce explained that "such a practice would penalize a more integrated company" because they "consume more material and energy inputs." *Id*. Moreover, the reasonableness of Commerce's analysis is not contingent on whether or not a particular party challenges its decision, and the fact that the only respondent that used steam did not challenge the determination is inapposite to the propriety of Commerce's analysis for SVs: Commerce simply did not find the fact that only one respondent uses steam sufficient to elevate the importance of steam coal over steam. *IDM* at 11. When considering steam as an energy input, Commerce analyzed its significance within Jiheng's consumption of all its energy inputs. *Id*. at 12. Weighing these inputs, Commerce found that electricity accounted for the largest portion of Jiheng's energy costs, followed by steam, and then slightly smaller amounts of steam coal. *Id*. Commerce concluded from this that steam was at least as meaningful as steam coal to use as an SV in this case. *Id*. The court cannot find fault in that conclusion.

The plaintiffs also contend that the Romanian record is superior in terms of the contemporaneity of its data because the electricity SV is one year old and its water SV is three years

old, while Mexico's labor SV is six years old. Pls' Br. at 19. The plaintiffs agree with the defendant that contemporaneity is only one of the factors that Commerce considers when choosing the best available information to use as surrogate values, *see IDM* at 12, but they disagree that contemporaneity is the only factor that differs among the surrogate values in question for labor, electricity, and water. Specifically, the plaintiffs argue that the labor rate comes from a time when the PRC was not considered economically comparable to Mexico, that adjusting for inflation would not address any significant changes in the labor market that would change the price of labor independent of normal inflation, and that it is "common" for water and electricity rates to remain stable for stretches of time. Pls' Br. at 19-20, referencing Pets' SVs (Dec. 17, 2015), PDocs 71-82, at Ex. 5 (Thai water rates in effect since 2012 at the time of this submission) & Ex. 12 (year 2008 versus year 2000 Mexican labor rate variations for several industries)

Despite the plaintiffs' preference to give more weight to the number of years out of date, Commerce found that Mexico was superior to Romania in terms of contemporaneity because "it had two more contemporaneous values for electricity and water, and only one less contemporaneous value for labor." *Id*. Commerce was able to adjust the labor value for Mexico through its normal method of inflating the value for labor by "using the Consumer Price Index rate for Mexico, as published by the International Monetary Fund . . . to account properly for inflation or changes in the labor rate over this time period." *Id*. at 12-13. *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 41 CIT ___, ___, 255 F. Supp. 3d 1312, 1323 (2017) (noting that Commerce adjusts data to contemporaneity where there are no contemporaneous data on the record). Although the plaintiffs allege that Commerce's adjustment is inadequate because of changes in

Case 1:17-cv-00032-RKM   Document 37   Filed 05/22/18   Page 20 of 20

Court No. 17-00032                                                                                          Page 20

Mexican labor rates between 2000 and 2008, Commerce determined that there was no record evidence of any significant changes or events in Mexico to affect its labor rate during the time period at issue. *Id*. Commerce therefore concluded that plaintiffs' argument that the older Mexican labor rate was to be less reliable was not supported by the record. *Id*.

In view of the foregoing, the plaintiffs' critiques of the Mexican record and CYDSA's financial statement do not persuade that Commerce's choices were unreasonable and without substantial support on the record. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("as to matters . . . requiring expertise a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*").

*Conclusion*

Having considered the arguments presented, the court finds Commerce's choice of Mexico as the primary surrogate country and its conclusion that CYDSA's financial statement was suitable for calculating financial ratios both supported by substantial evidence on the record and in accordance with law. The plaintiffs' motion for judgment must therefore be, and hereby is, denied.

**So ordered**.


/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: May 22, 2018
       New York, New York